THE CLINIC & HOSPITAL, INC., APPELLANT, v. RICHARD McCONNELL AND MARGUERITE McCONNELL, HIS WIFE, RESPONDENTS.—236 S. W. 2d 384.

Kansas City Court of Appeals. Opinion delivered February 3, 1951.

*Frances G. Hale* and *Robert E. Coleberd* for appellant.

*Lawson, Hale & Coleberd* of counsel.

*Simrall & Simrall* and *James S. Simrall, Jr.*, for respondents.

BOUR, C.—Plaintiff instituted this suit in the circuit court of Clay County, Missouri on April 19, 1949, seeking to enjoin defendants from operating a "loud speaker, amplifier and broadcasting device" in connection with their business. The case was transferred to the circuit court of Clinton County on defendants' application for change of venue. It was tried on October 5, 1949, and taken under advise- ment until October 31, 1949, when the court entered judgment in favor of defendants, and, after an unavailing motion for a new trial, plaintiff appealed.

It is alleged in the first three paragraphs of the petition that plaintiff corporation for many years has been and is now engaged in the operation of a clinic and hospital in Excelsior Springs, Missouri; that defendants have been and are now engaged in the operation of a music store located on Thompson Avenue in said city, and directly across the street from the easterly part of plaintiff's clinic and hospital; and that defendants installed in the front part of their store "a loud speaker, amplifier and broadcasting device projected into said Thompson Avenue and directly towards plaintiff's said place of business * * *." It is alleged in the other paragraphs of the petition that defendants have consistently, maliciously and in reckless disregard of plaintiff and the comfort and well-being of the patients in its clinic and hospital "constantly, day and night, broadcast through and by their said amplifying device, noise, racket and alleged music which could and can be heard for two blocks from defendants' said

place of business, \* \* \* all for the purpose of commercial advertising, \* \* \* and for the additional purpose of annoying, pestering and interfering with the reasonable peace and quietude of plaintiff's said clinic and hospital and of its patients therein''; that by reason of said conduct on the part of defendants ''divers and sundry of plaintiff's patients have been compelled to leave said clinic and hospital before they had received proper treatment for their several ailments, and divers and sundry prospective patients of plaintiff's clinic and hospital have been deterred from and have refused to enter said clinic and hospital for diagnosis, surgical treatment and hospitalization''; that ''the aforesaid acts and conduct of defendants, and each of them, are in direct violation of Ordinance No. 4863 of said city \* \* \*''; that ''by reason of all of the aforesaid facts plaintiff has suffered, and now suffers, irreparable damage and injury for which it has no adequate remedy at law.'' Plaintiff prayed for permanent injunctive relief, but did not ask for damages. Defendants' answer admitted the allegations contained in the first three paragraphs of the petition, and denied all other allegations therein.

Plaintiff contends that the finding and judgment of the chancellor is against the law and the weight of the evidence. In an equity case, the appellate court must weigh the evidence and make its own findings on the law and the facts. Where, however, there is a conflict in the oral testimony and the credibility of witnesses must be determined, it is the rule to defer to the chancellor's finding unless the appellate court is satisfied that the weight of the evidence is clearly to the contrary. Compton v. Vaughan, Mo. Sup., 222 S. W. 2d 81, 83; Golden v. Golden, Mo. App., 197 S. W. 2d 716.

The record discloses that plaintiff corporation operates the McCleary Clinic and Hospital in Excelsior Springs, Missouri. Since 1925, its main hospital building has been located at the northwest corner of the intersection of St. Louis Avenue, an east and west street, and Thompson Avenue, a north and south street. Annex ''C'' of plaintiff's clinic and hospital is on the west side of Thompson Avenue and north of the main building. A small house is situated on the west side of Thompson Avenue between the main building and Annex ''C''. Plaintiff's Annex ''D'' is on the east side of Thompson Avenue and three doors north of defendants' ''Tune In'' music shop. At the time plaintiff's hospital was established on Thompson Avenue that part of the town was a business district.

The defendants, Richard McConnell and Marguerite McConnell, are husband and wife. They have operated the ''Tune In'' music shop since November, 1947. This shop fronts west and is located on the east side of Thompson Avenue, directly across the street from the small house mentioned above and diagonally across the street from plaintiff's main building and Annex ''C''. One of plaintiff's witnesses testified that ''the McCleary building would be approximately fifty-five feet from the 'Tune In' shop across the street,

roughly." In February, 1948, the defendants installed a so-called loud speaker in the shop for the purpose of advertising their business. This loud speaker is located in an opening in the front window of the shop and pointed in the general direction of plaintiff's main building and Annex "C". It is connected with and operated by an electric record player which is inside the shop. The volume of the sounds which emanate from the loud speaker can be regulated by turning a knob on the record player.

Plaintiff called seventeen witnesses. Plaintiff's evidence was that defendants operated the record player and loud speaker every day from 8:00 or 9:00 a. m. until 7:00 or 8:00 p. m.; that on many occasions the machine was operated as late as 10:00 or 11:00 p. m.; and that during the hours mentioned the records were played almost continuously. The music reproduced through the loud speaker was distinctly audible in plaintiff's main hospital and clinic building, in the operating and recovery rooms, and in Annex "C" and Annex "D", above the usual noises of the street traffic.

Two operating rooms and several post-operative recovery rooms are located on the second floor of the main building and diagonally across the street from defendants' shop. After a patient has undergone surgery, he is removed to one of the recovery rooms and kept there for about 24 hours, then moved to another part of the hospital. Dr. Kepler, one of plaintiff's surgeons, and two surgical nurses connected with plaintiff's hospital, testified that music emanating from defendants' loud speaker disturbed patients in the recovery rooms, causing them to become very restless and nervous, and that it was necessary to give some of them additional sedatives. The nurses stated that the music was "loud" and could be heard "above the traffic." Dr. Kepler said that while the music disturbed some patients it did not disturb all of them.

Annex "C" is used for the treatment of patients suffering from gastro-intestinal disorders and diseases of the colon. Dr. Kessler, who had charge of these patients, testified as follows: "These patients are generally the nervous, tense type of individual, and we put them over there for the reason that they are of that type and need quiet, rest, and relaxation along with their treatment. They have found it rather disturbing to have to be in these rooms where they have to listen to this constant, or more or less constant, broadcasting or recording or playing of this music from time to time. * * * It is not conducive to their improvement, and it has been necessary at times to close the windows to lessen the noise. And I have found some of the patients with their ears stuffed with cotton; others we have had to move to the rear of the building, but couldn't move all to the rear. We have had some patients, too, that have checked out because we had no other place to care for them, and they couldn't take any more of the noise or music, and we have had quite an experience with it. * * * Q. Is it your opinion that the progress toward

recovery or response to the treatment of patients in Annex 'C' has been retarded by reason of the noise coming from across the street? A. Yes, sir, oftentimes that is the case.'' This testimony was corroborated by Julia Bolch, a nurse who had worked in Annex ''C'' for two years. Dr. Kessler further testified that certain patients were placed in Annex ''C'' in order to get them ''away from the general noises of the hospital'' and ''entertainments'' given in the lobby of the main building for the benefit of other patients, and to give them private beds, ''24-hour-a-day service, with special diet and as much relaxation and quiet as possible.''

R. B. Hedges, plaintiff's assistant administrator, stated that on many occasions during a period of approximately two years, he had heard the music when he was in the operating and recovery rooms and in Annex ''C''; and that the music was audible in plaintiff's buildings the day before the trial.

B. C. Hedges, president of plaintiff corporation, testified that on two occasions he called on defendants and requested them to reduce the volume of the music and explained that it was disturbing the patients; that he ''reasoned with them from the standpoint of business people, fair. play, fair dealing, and not only the economic side of the clinic, but the inhuman side to suffering people''; that defendants continued to broadcast the music ''just as they had always done,'' and on several occasions he complained to the city officials. He said he had been in ''various parts of the clinic at the time when the broadcasting was coming from across the street and heard the broadcasting.'' He testified on cross-examination that the city had placed signs on St. Louis Avenue and Thompson Avenue reading ''Quiet, Hospital''; and that when he called on defendants he was able to carry on a conversation inside the shop but the music ''was pretty loud—just as loud inside as out.''

A. L. Forsythe testified that in June, 1949, he was a patient in Annex ''C'' for ten days; that during the time he was hospitalized defendants operated the record player every day, beginning about nine o'clock in the morning and continuing throughout the day and evening; that he was in a ''bad condition and highly nervous'' when he entered the hospital, and the music made him more nervous. He further stated that he had been employed at the post office located at the intersection of St. Louis Avenue and Thompson Avenue, some 200 feet south of defendants' music shop; that the music could be heard inside the post office when the windows were open, and ''in a modified form'' when the windows were closed. He stated on cross-examination that he had known the president of plaintiff corporation more than 25 years; and that prior to entering the hospital he had heard music coming from defendants' shop.

O. C. Slover, assistant chief of police in Excelsior Springs, testified as a witness for plaintiff that on two occasions he requested defendants to reduce the volume of the music and they did so; that on a third

occasion when the record player we being operated at 10:40 p. m., he "went inside the shop and asked Mr. McConnell to shut down on the record player, and he said, * * * 'I won't shut it down. It is my place of business—nobody's business but my own.'" This witness said that he had received complaints from plaintiff's employees and patients, but not from "the other people in that block." Defendants rely heavily upon Officer Slover's testimony that the music was not "particularly noticeable" inside the stores "adjoining the 'Tune In' shop along Thompson Avenue," and that while driving a patrol car on Thompson Avenue he could not hear the music beyond a point 40 to 45 feet from defendants' shop. But this testimony does not justify the inference that the music was not distinctly audible in plaintiff's buildings. Furthermore, this witness testified that the music could be heard "down by the police station." According to other testimony in the record the police station is 200 to 250 feet north of defendants' shop.

Defendants also rely upon certain testimony of plaintiff's witnesses Wagoner and Miller. Mr. Wagoner, mayor of Excelsior Springs, stated that he operated a cafe on the east side of Thompson Avenue about 200 feet south of defendants' music shop; that the broadcasting could be heard in the front part of his cafe when the door was open; that it did not interfere with his business; and that he had heard the music as late as nine o'clock at night. Mr. Miller, the owner of a business located on Thompson Avenue about 75 feet south of defendants' shop, testified that while the music coming from defendants' loud speaker could be heard in front of his store, it could not be heard inside and it did not annoy him or interfere with his business in any way. But the fact that the broadcasting did not interfere with the operation of these stores does not warrant the conclusion that it did not annoy and disturb the patients in plaintiff's hospital. As stated, one of plaintiff's witnesses testified that "the McCleary building would be approximately fifty-five feet from the 'Tune In' shop across the street, roughly," and this testimony was not contradicted. It is to be borne in mind that the stores of witnesses Wagoner and Miller as well as the stores referred to by Officer Slover are located on the same side of Thompson as defendants' shop, whereas the plaintiff's main building and Annex "C" are situated on the west side of Thompson Avenue and diagonally across the street from the music shop. Furthermore, the loud speaker in defendants' front window is pointed in the general direction of plaintiff's main building and Annex "C". Certainly the testimony of plaintiff's witnesses Slover, Wagoner, and Miller did not conflict with the other testimony offered by plaintiff.

Mr. Wagoner further testified that he told defendants about the complaints coming from plaintiff and its patients and requested them to reduce the volume of the music, but defendant Marguerite McConnell informed him that defendants "were trying to make a living, that they would run their business according to their own policy."

He said he built a baffle board for defendants to place over the loud speaker to direct the sound toward the sidewalk and away from plaintiff's building, but so far as he knew defendants never used it.

The ordinance referred to in the petition was introduced in evidence by plaintiff. However, it is not mentioned in plaintiff's brief and will not be considered here.

Defendants offered no evidence except their own testimony. Richard McConnell testified that he and his wife had operated the music shop since November, 1947, and they installed a loud speaker in February, 1948; that the shop had never been kept open after 8 p. m., except on Saturdays when it was not closed until 9 p. m.; that he did not "recall" having operated the loud speaker as late as 11 p. m.; that he never refused to reduce the volume of the music when requested to do so, but on one occasion he did refuse to turn off the loud speaker completely; that "McCleary's (plaintiff) and two or three of their patients" had complained to him about the loud speaker, but he had received no complaints "from any people locally"; that a short time before this suit was instituted defendants installed a new record player and loud speaker; that the new loud speaker has a "smoother volume—hasn't any high pitch to it"; that it could not be heard more than 25 or 35 feet from the music shop; and that when he listened to it from across the street he could hear it "faintly."

Richard McConnell testified on cross-examination that after this suit was instituted, and about two months before the trial, two or three of plaintiff's patients complained to him about the music and he reduced the volume but increased it the next day; that on three or four occasions the city police came to the shop and "I told them I would turn it down temporarily. They said the complaints was from somebody sick. Q. What did you mean by 'temporarily'? A. Well, for the rest of the day or something like that. * * * For anybody unusually sick. Q. And that is all you did, just turn it down temporarily? A. That is the truth. * * * Q. Well, it is your purpose and intention to continue this broadcasting out into the street? A. The way it is now, yes. * * * Q. Then it is your purpose to continue doing what you consider you have a right to do, and to continue those broadcasts? A. That is true."

The testimony of defendant Marguerite McConnell was substantially the same as that of her husband. She stated, however, that the new loud speaker could be heard at Miller's grocery store, which is on Thompson Avenue about 75 feet south of defendants' shop; and that it could be heard approximately the same distance north of the shop.

Defendants earnestly insist that the new equipment reduced the volume to such an extent the music did not disturb the patients. Touching this matter, Dr. Kepler testified that the music "wasn't as loud as it used to be" and "it bothered the patients more last Winter— than since that time." Dr. Kessler said "the music hasn't been so loud lately." Officer Slover stated that it was not "turned up as

high as it was a year ago''; that ''a year ago you could hear it down by the police station,'' and ''Q. But that is not true at the present time? A. We haven't heard it that loud.'' As heretofore stated, Mr. Forsythe testified that during his ten-day confinement as a patient in Annex ''C'' he heard the music every day and it made him nervous. He was admitted to Annex ''C'' in June, 1949, which was after defendants installed the new equipment. One of the nurses testified that on October 3, 1949, two days before the trial, the loud speaker was operating at 10:20 p. m. and could be heard inside Annex ''C''. It is true that Richard McConnell said the new loud speaker could not be heard more than 25 or 35 feet from the music shop, and that when he listened to it from across the street he could hear it ''faintly''; but he also stated that about two months before the trial, two or three patients complained to him about the music and he reduced the volume at their request. And, as stated, his wife said the new loud speaker could be heard at a distance of 75 feet. It seems quite clear from the evidence as a whole that the volume was not reduced to such an extent that the music could not be heard in plaintiff's buildings, or that it ceased to be a source of considerable annoyance and discomfort to the patients.

It will be observed that no witness testified from his own knowledge that the music was not distinctly audible in plaintiff's clinic and hospital at the times in question, or that it did not disturb the patients. We think the great weight of the evidence established the following facts: That defendants broadcast the music substantially all day and on many occasions as late as 10:00 or 11:00 o'clock at night; that the music was distinctly audible in the easterly part of plaintiff's main building, in the recovery rooms, and in Annex ''C'' and Annex ''D'', above the usual noises of the business district; that the sounds emanating from defendants' loud speaker were substantially different from the sounds and noises incident to the business district; that the music disturbed some but not all of the patients in plaintiff's clinic and hospital; that it injuriously affected some of the patients and retarded their recovery; that some patients left the hospital because they could not endure the music; that the broadcasting materially interfered with the conduct of the clinic and hospital and constituted a substantial invasion of plaintiff's right to the use and peaceful enjoyment of its property; that the defendants continued the broadcasting after they were informed that their conduct was harmful to the patients; that the conditions complained of had existed for approximately two years and without any substantial change for the better.

Generally speaking, a person has the right to the exclusive control of his property and the right to devote it to such uses as will best subserve his interests; but these rights are not absolute. There are certain uses to which property may be put which so seriously interfere with the use and enjoyment by others of their property or with the rights of the public that they must be forbidden. Clutter v. Blanken-

ship, 346 Mo. 961, 964, 144 S. W. 2d 119, 121. "It is the law that one may not make such an unreasonable, unusual or unnatural use of his property that it substantially impairs the right of another to peacefully enjoy his property. Neither is it questioned that a court of equity may issue an injunction enjoining the use of property or a manner of carrying on a business if either constitutes a nuisance injuring another or his property. Crutcher v. Taystee Bread Co., Mo. Sup., 174 S. W. 2d 801." Schott v. Appleton Brewing Co., Mo. App., 205 S. W. 2d 917, 920; Rhodes v. A. Moll Grocer Co., 231 Mo. App. 751, 95 S. W. 2d 837. Even though the nuisance complained of is a public one, yet a private person can maintain an action to abate it, if he suffers thereby a special injury not common to the community in general. Hayden v. Tucker, 37 Mo. 214; New v. South Daviess County Drainage Dist., 240 Mo. App. 807, 815, 220 S. W. 2d 79, 82; Cambest v. McComas Hydro-Electric Co., 212 Mo. App. 325, 330, 245 S. W. 598, 600.

Noise is not a nuisance per se, but it may be of such a character as to constitute a nuisance, even though it arises from the operation of a lawful business. Magel v. Gruetli Benevolent Society of St. Louis, 203 Mo. App. 335, 218 S. W. 704; Blackford v. Heman Const. Co., 132 Mo. App. 157, 163, 112 S. W. 287, 290; Anderson v. Guerrein Sky-Way Amusement Co., 346 Pa. St. Rep. 80, 29 Atl. 2d 682 (decree limiting operation of open-air sound-equipped motion picture theater); Payne v. Johnson 20 Wash. 2d 24, 145 P. 2d 552 (same as last case.) In Stedder v. Rosen Talking Machine Co., 241 Mass. 245, 135 N. E. 251, 22 A.L.R. 1197, Id. 247 Mass. 60, 141 N. E. 569, a merchant, for advertising purposes, operated a phonograph at the front door of his store continuously for the greater part of the day. The music was distinctly audible in places of business on the opposite side of the street, causing the occupants thereof and their employees much discomfort and materially interfering with the conduct of their business. Injunctive relief was granted. A case similar in many respects to the one before us is Palm Corporation v. Walters, 148 Fla. 527, 4 So. 2d 696, wherein it appears that Dr. Walters and his wife had erected a building on their land, a part of which was used for his office, and part for shops and living quarters. Sometime later, defendant corporation erected a hotel next to the Walters building. In a suit by Walters and his wife against the corporate owner of the hotel and its lessees to enjoin the continuance of acts causing offensive odors and noises to penetrate plaintiff's building, it was claimed, among other things, that the odors and noises emanating from the hotel disturbed the doctor's patients and caused some of them to leave his office without treatment. It was held that plaintiffs were entitled to equitable relief. See also Fos v. Thomassie, La. App., 26 So. 2d 402 (electrically operated loud speaker on outside of eating establishment for entertainment of customers seated

in automobiles; injunction granted); Five Oaks Corporation v. Gathmann, Md. App., 58 Atl. 2d 656 (similar to last case.)

The foregoing cases and many others show that a business which is lawful in itself may become a nuisance where it is not operated in a fair and reasonable way with regard to the rights of others in the use and enjoyment of their property. The courts have made it clear that in every case the question is one of reasonableness. What is a reasonable use of one's property and whether a particular use is an unreasonable invasion of another's use and enjoyment of his property cannot be determined by exact rules, but must necessarily depend upon the circumstances of each case, such as locality and the character of the surroundings, the nature, utility and social value of the use, the extent and nature of the harm involved, the nature, utility and social value of the use or enjoyment invaded, and the like. See Restatement, Torts, Vol. IV, secs. 822, 831, pp. 214, 265. The use of property for a particular purpose and in a particular way in one locality may be reasonable and lawful, but such use may be unreasonable, unlawful and a nuisance in another locality. Magel v. The Gruetli Benevolent Society of St. Louis, 203 Mo. App. 335, 349, 218 S. W. 704, 708. While the weight of authority is that priority of occupation is not a defense as to one maintaining a nuisance, some courts have expressed the view that it is a factor to be considered in determining the character of the locality. See Hayden v. Tucker, supra; Schott v. Appleton Brewing Co., supra; and cases cited in 167 A.L.R. 1364. It is true, of course, that persons who live or work in thickly populated communities or in business districts must necessarily endure the usual annoyances and discomforts incident to the conduct of those trades and businesses which are properly located and carried on in the neighborhood where they live or work. But these annoyances and discomforts must not be more than those ordinarily to be expected in the community or district, and which are incident to the lawful conduct of such trades and businesses. If they exceed what might be reasonably expected and cause unnecessary harm, then the court will grant relief. Schott v. Appleton Brewing Co., supra; Sullivan v. Royer, 72 Cal. 248, 13 P. 655; Five Oaks Corp. v. Gathmann, Md. App. 58 Atl. 2d 656, 39 Am. Jur., Nuisances, sec. 44, p. 325.

The evidence shows that plaintiff's hospital was established on Thompson Avenue in 1925, about 22 years before defendants opened their music shop. It is true that stores and shops were being operated on Thompson Avenue at the time the hospital was established, but the sounds complained of are not inherent in the character of that locality. There is nothing in the record to show that any merchants in that vicinity, except the defendants herein, have ever broadcast music for any purpose. On the contrary, it appears that the sounds broadcast by defendants are substantially different from all other sounds and noises incident to the usual activities in that district. The

record does not show that the other noises are harmful to the patients or that they interfere with the operation of the clinic and hospital. Under these circumstances, it cannot be said that plaintiff's business is unsuited to the character of the locality.

Furthermore, clinics and hospitals are essential to the functioning of society, and substantial interference with their operation under almost any circumstances is relatively serious. There can be no doubt that defendants have the right to operate their music shop in its present location so long as the business is conducted in a reasonable manner with regard to the rights of others. We think, however, that the broadcasting of the music in the manner described and with the results set forth in our findings is an unusual, unreasonable, and unlawful use of defendants' property, in the particular location and under the conditions with which we are here confronted. Furthermore, defendant Richard McConnell testified that he intended to continue the broadcasting "the way it is now." It is clear, therefore, that plaintiff is entitled to equitable relief.

On the other hand, freedom of action on the part of one person ought not to be curtailed more than is necessary for the public welfare or the protection of the rights of some other person. Blackford v. Heman Const. Co., 132 Mo. App. 157, 166, 112 S. W. 287, 290. In the present case, the chancellor should have entered a judgment perpetually enjoining the defendants, and each of them, from operating any loud speaker or sound amplifier, or any record player or phonograph, or permitting the same to be operated in or about their place of business, in such manner as to cause the music or sounds produced by any such device to be audible in any part of plaintiff's said clinic and hospital buildings devoted to the care and treatment of patients.

For the reasons stated, it is the recommendation of the Commissioner that the judgment be reversed and the cause remanded with directions to enter a judgment to the above effect. *Sperry, C.,* concurs.

PER CURIAM:—The foregoing opinion of BOUR, C., is adopted as the opinion of the court. The judgment of the circuit court is reversed and the cause remanded with directions as recommended by the Commissioner. All concur.