**Susan McKinney BOES,**
**Plaintiff/Appellant,**

v.

**Dottie DESCHU, Individually and as a representative of a class of persons comprising the membership of the Crisis Pregnancy Center, an unincorporated association, Defendant/Respondent.**

No. 54749.

Missouri Court of Appeals,
Eastern District,
Division Four.

Feb. 28, 1989.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 3, 1989.

Application to Transfer Denied
May 16, 1989.

Tom P. Mendelson, St. Louis, for plaintiff/appellant.

Daniel T. Rabbitt, Jr., Thomas C. Werner, David P. Ellington, St. Louis, for defendant/respondent.

SATZ, Judge.

Plaintiff, Susan Boes, appeals the dismissal of her petition. We affirm, in part, and reverse and remand for further proceedings.

Defendant is Dottie Deschu, "individually and in her capacity as the representative of a class of persons compromising the membership of a voluntary unincorporated association operating as the Crisis Pregnancy Center...." Plaintiff sued defendant for the intentional infliction of emotional distress. In her petition, plaintiff alleges the following facts.

In December 1986, believing that she might be pregnant, plaintiff responded to an advertisement by the Crisis Pregnancy Center (CPC) that offered "a free pregnancy test" and "abortion counseling". She believed CPC was a place where an abortion could be obtained. She wanted a free pregnancy test, but she had no intention of obtaining an abortion.

On December 8, 1986, accompanied by her mother, plaintiff went to the CPC office for her scheduled appointment. While there, she talked with two CPC staff members, defendants X and Y, whose names are not known. She gave to X a requested urine sample for the pregnancy test. She was then interviewed by Y, who identified herself as a "counselor".

Plaintiff told Y she had an abortion at age 15 and the abortion had been a traumatic experience. She also told Y that, "following" the abortion, she had been hospitalized for depression and that she was taking antidepressant and antianxiety medications prescribed by a psychiatrist. In addition, she told Y that if she were pregnant she would go forward with her pregnancy and give birth to the child.

X and Y learned that plaintiff's pregnancy test was negative, but they withheld this information from her. Instead, they showed plaintiff a film "featuring mutilat-

ed advanced fetuses" and containing "purported personal and medical" comments on "the evil of abortion and the ineradicable harm" it causes the pregnant woman.

After the film was shown, X and Y expressed their moral and religious views on sex and abortion. They told plaintiff that religion was the "sole means of expiation" for a woman, like plaintiff, who had undergone an abortion. They then informed her that she was not pregnant.

X and Y established "a counseling relationship" with plaintiff "under false pretenses" and "sought to ... exploit [her] history and the intimacy and trust" of this relationship in order to further CPC's "proselytical aims." The conduct of X and Y "was extreme and outrageous, beyond all bounds of decent and respectful dealings woman-to-woman, and intentionally (or at a minimum recklessly) perpetrated,...."

As a result of this experience, plaintiff became "highly distressed, upset and tearful, and developed attendant physical symptomatology," necessitating emergency psychiatric care. This experience also caused "an episodic exacerbation of her ongoing chronic depression, [to a] significant degree." Despite psychotherapy and increased dosages of her medications, she has continued to experience "distress, depression and anger."

X and Y were "authorized by" CPC's members to act as described. For this conduct, plaintiff seeks $150,000, actual damages, and $300,000, punitive damages.

Defendant, Dottie Deschu, in her representative capacity, filed a motion to dismiss the petition for failure to state a claim for relief and also requested she be dismissed in her representative capacity because no showing was made that she would "fairly and adequately" represent CPC and its members. In her individual capacity, she filed a separate motion to dismiss because plaintiff failed "to state a claim for relief against her individually." The court apparently granted both motions[1] and did so without stating any reasons.

1. In its order the court refers to defendant's motions in the singular:

Since the court granted the motions without specifying its reasons, we presume the dismissals were on the grounds alleged in the motions. *E.g. St. Louis County Housing Auth. v. Lovejoy*, 731 S.W.2d 510, 511 (Mo.App.1987). We determine first whether plaintiff properly pleaded a claim for intentional infliction of emotional distress.

We recognize the tort of intentional infliction of emotional distress. *See, e.g. Pretsky v. Southwestern Bell Telephone Co.*, 396 S.W.2d 566, 568 (Mo.1965); Restatement (Second) of Torts, § 46 (1965).[2] The tort has four elements: (1) the defendant must act intentionally or recklessly, (2) his conduct must be extreme and outrageous, (3) the conduct must be the cause (4) of severe emotional distress. *See, e.g., LaBrier v. Anheuser Ford, Inc.*, 612 S.W.2d 790, 793 (Mo.App.1981).[3] The single issue here is whether plaintiff has pleaded conduct which is "extreme and outrageous."

A precise definition of "extreme and outrageous" conduct cannot be found in our case law. *See, e.g., Viehweg v. Vic Tanny*, 732 S.W.2d 212 (Mo.App.1987); *Rooney v. National Super Markets, Inc.*, 668 S.W.2d 649 (Mo.App.1984); *Young v. Stensrude*, 664 S.W.2d 263 (Mo.App.1984). Missouri is no different than other jurisdictions in this respect. *See* Restatement, Appendix, § 46, reporting cases 1964–1984. This lack of a clear definition of the prohibited conduct is understandable. "The term 'outrageousness' [as used] is neither value free or exacting. It does not objectively describe an act or series of acts; rather, it represents an evaluation of behavior." Givelber, *The Right to Minimum Social Decency and the Limits of Evenhandedness: Intentional Infliction of Emotional Distress by Outrageous Conduct*, 82 Col.L.R. 42, 51 (1982).

... [the] Court sustains [defendant's] Motion to Dismiss as a Representative of the Crisis Center and individually.

**2.** All references to the "Restatement" will be to the Restatement (Second) of Torts (1965) unless otherwise stated.

**3.** The Restatement defines the tort:

However, the authors of the Restatement, having found or created the tort, provide general definitional guidelines which we and other courts rely upon. Thus, the test for actionable conduct is whether it

> has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Restatement § 46, comment (d). *E.g. Pretsky v. Southwestern Bell, supra*, at 569.

The liability

> does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.

*Id. E.g. Viehweg v. Vic Tanny, supra*, at 213.

The suggestion by the Restatement to have the standard set by an "average member of the community" makes the court, on a motion to dismiss, an evaluator of public sentiment. This duty, however, is not completely unmanageable. The Restatement also points out

> The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests.... In particular police officers, school authorities, landlords, and collecting creditors have been held liable for extreme abuse of their position.

Restatement § 46, comment e.

Thus, the tort is typically invoked where there is a preexisting legal relationship be-

**§ 46** *Outrageous Conduct Causing Severe Emotional Distress*
(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress....

....

tween the parties—employer-employee, creditor-debtor, landlord-tenant, insurer-insured—and the plaintiff claims the defendant "has behaved intolerably in attempting either to assert or avoid his or her rights and obligations flowing out of that relationship." Givelber, *supra*, at 63. These are traditional legal relationships, and, thus, the court has traditional public values to use in determining whether the parties acted civilly in their dealings and disagreements. *See, e.g., Leonard v. Pioneer Finance Co.,* 568 S.W.2d 937 (Mo. App.1978); *Watson v. Franklin Finance,* 540 S.W.2d 186 (Mo.App.1978).

This is not the case here. Neither party can lay claim to a preexisting related or underlying agreement binding them. More important, perhaps, the complained of conduct grows out of public sentiments often categorized as "pro-life" and "pro-choice", deeply divided sentiments, to say the least. But, that does not mean the conduct here cannot be properly characterized. The extreme and outrageous character of the conduct

> may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know.
>
> *LaBrier v. Anheuser Ford, Inc.,* 612 S.W.2d 790, 793 (Mo.App.1981) (quoting Rest. § 46, comment f).

In reviewing the dismissal of plaintiff's petition, we accept as true the facts as pleaded and all reasonable inferences. *Watson v. Franklin,* 540 S.W.2d at 188. According to her petition, plaintiff told CPC's employees she would not undergo an abortion if she were pregnant. She told them she had undergone an abortion at age 15 and had suffered emotional problems requiring the continued treatment of a psychiatrist. She also told them she was still taking medication for her emotional problems. The employees also knew plaintiff's pregnancy test was negative. Nonetheless, they kept the result of the test

from her and proceeded to show her a film "featuring mutilated advanced fetuses" and to tell her that religion was the sole "expiation" for women, like her, who have had an abortion.

CPC's employees, thus, acted with knowledge of plaintiff's extreme vulnerability to emotional distress regarding her abortion. The showing of the film, it can be reasonably inferred, was calculated to dissuade plaintiff from obtaining an abortion. But, the employees had been told she was not interested in having an abortion. Their conduct, it can be inferred, was calculated to exploit plaintiff's vulnerability and to reawaken her guilt, in an inexplicable attempt to "strengthen" her stated resolve not to have an abortion.

█ Is this conduct outrageous, beyond the bounds of decency? If the existence of the conduct is shown by plaintiff, the question of its outrageousness would be reasonably debatable and, thus, should be submitted to the jury. *LaBrier v. Anheuser Ford, Inc.,* 612 S.W.2d at 794; Restatement § 46, Comment L. Hence, plaintiff has stated a claim.

Both parties rely on *Young v. Stensrude,* 664 S.W.2d 263 (Mo.App.1984) to support their opposing views. The facts alleged in *Young* are facially similar to the facts alleged here. In *Young,* plaintiff, a woman, alleged that defendant, after representing a film to be educational, showed plaintiff a pornographic movie, in the presence of four other men making obscene remarks. This Court found these allegations stated a claim for intentional infliction of emotional distress.

Defendant attempts to distinguish those facts from the present ones. Here, defendant points out, plaintiff alleges she came to CPC voluntarily, and, with her mother, watched an "educational" film on abortion, unaccompanied by obscene remarks and not viewed in the presence of male strangers. Even with these noted distinctions, we find the facts alleged here more compelling than *Young.*

In the context of the present allegations, defendant's characterization of the film as "educational" is strange. Education presupposes ignorance, and, plaintiff, to her

alleged misfortune, was not ignorant about abortion. She was "educated" by one of the best teachers: experience. While the present film was not pornographic, it was, as described by plaintiff's brief, wrenchingly anatomical, designed to have a strong emotional impact on pregnant women. Moreover, the plaintiff in *Young* was not alleged to be susceptible to emotional distress. She was, apparently, employed, working in our present day permissive society, not confined to a polite society with Victorian manners and courtesies. Here, in contrast, plaintiff allegedly had been traumatized by an abortion and, thus, was vulnerable to emotional distress; all of which was known by defendant.

In *Young*, this Court did not evaluate the relative importance of the alleged facts: defendant's alleged guile, showing a pornographic movie, in the presence of males, with obscene remarks. The Court did however, state:

... we cannot say, ..., ... these [alleged] acts could not as a matter of law, constitute an actionable wrong.

[To do otherwise] would subject, [the] plaintiff, as a matter of law, to unwilling exposure to acts which may be totally intolerable in today's civilized society.

*Id.* at 265.

On the present alleged facts, we can do no less.

Defendant notes that plaintiff does not allege she was forced to view the film or was forced to listen to CPC's employees. Defendant, however, does not contend on appeal plaintiff's failure to leave CPC's premises was an implied consent to the employees' conduct nor does she contend this "consent" would vitiate the tort. Thus, we do not reach the question of whether non-consent is an element of plaintiff's prima facie case or whether consent is an affirmative defense available to defendant.

There were two other grounds for dismissal raised by defendant in her motions before the trial court: (1) plaintiff's alleged failure to properly plead that defendant was the representative of a class, under Rule 52.10 and (2) plaintiff's alleged failure to plead a claim against her individually.

We disagree with defendant on the former ground and agree with her on the latter.

■ Rule 52.10 provides:

An action brought by or against the members of an unincorporated association as a class by naming certain members as representative parties may be maintained only if it appears that the representative parties will fairly and adequately protect the interests of the association and its members.

To comply with this provision, plaintiff alleges:

The defendant Deschu is an individual who is sued both individually and in her capacity as the representative of a class of persons comprising the membership of a voluntary unincorporated association operating as [CPC].... The defendant Deschu was on the date [of the conduct complained of] a member and the executive director of and the spokesperson for [CPC]. As such she will fairly and adequately protect the interests of the association and its members, the names of whom are not presently known except for that of Dottie Deschu.

These allegations meet the requirements of Rule 52.10. The Rule does not require the detailed pleading urged by defendant. Moreover, Rule 55.13 provides:

"It shall be sufficient to aver the ultimate fact of the capacity of a party to sue or be sued or the authority of a party to sue or be sued in a representative capacity...."

Understandably, in her brief on appeal, defendant does not contend these allegations are insufficient to support a class action against CPC.

■ Defendant does, however, refer to the issue of her individual liability in the argument portion of her brief. We agree with defendant. We have read plaintiff's petition carefully, giving it the most liberal interpretation. *Watson v. Franklin*, 540 S.W.2d at 188. The petition does not allege any individual liability of defendant.

Plaintiff bases her claim on the theory of vicarious liability, which, plaintiff contends, is reflected in her allegations that:

[X and Y acted] in pursuance and contemplation of a plan and conspiracy be-

tween themselves and with the defendant Deschu and the other members of [CPC]

. . . . .

[The acts of X and Y were] expressly or impliedly authorized by the association members. . . .

▇ Admittedly, a member of a voluntary association may be personally liable if she has participated in, authorized, or ratified the conduct in issue. *State ex rel. Ashcroft v. Kansas City Firefighters Local 42*, 672 S.W.2d 99, 124 (Mo.App.1984). However, plaintiff, in her argument, does not show the precise method these separate allegations are to be pieced together to establish defendant's individual, vicarious liability. We are precluded from becoming an advocate for plaintiff and developing reasoning not clearly urged by her. *May Dept. Stores Co. v. Adworks, Inc.*, 740 S.W.2d 383 (Mo.App.1987). Nor are we aided by plaintiff's alternative suggestion, made as a bald statement, that the phrase "in pursuance of a plan and conspiracy" supports "the imposition of agency liability founded on the law of civil conspiracy." Although our pleading principles abolish the technicalities of pleading, they do not abolish the need for clarity and clear thinking. *Bennett v. Mallinckrodt, Inc.*, 698 S.W.2d 854, 865 (Mo.App.1985).[4]

On the present record, we affirm the dismissal of defendant individually and reverse and remand this cause for further proceedings.

SMITH, P.J., and STEPHAN, J., concur.

---

**4.** Defendant refers to a possible abridgement or infringement of the constitutional rights of freedom of speech and religion. No argument, however, is developed. Thus, we do not address this issue. *See, e.g., Richardson v. Colonial Life and Accident Ins. Co.*, 723 S.W.2d 912, 916 (Mo. 1987).

Of course, "freedom of speech" does not prevent all restrictions on speech. One may be prosecuted for perjury or sued for slander. Certain classes of speech, "which by their very

utterance inflict injury," are not protected by the First Amendment. *State v. Koetting*, 691 S.W.2d 328, 331 (Mo.App.1985), citing *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–2, 62 S.Ct. 766, 769, 86 L.Ed. 1031, 1035 (1942).

Nor does the free exercise of religion clause prevent liability for certain intentional tortious conduct, even when committed by the clergy and related to the promotion of religious beliefs. *Hester v. Barnett*, 723 S.W.2d 544, 552 (Mo.App.1987).