## In re TMI LITIGATION CASES CONSOLIDATED II

This Document Relates to: All Plaintiffs.

Civ. A. No. 1:CV–88–1452.

United States District Court, M.D. Pennsylvania.

Feb. 18, 1994.

Arnold Levin, Philadelphia, PA, Lee C. Swartz, Hepford, Swartz & Morgan, Harrisburg, PA, for Levin.

Dusan Bratic, Bratic & Portko, Dillsburg, PA, Louis M. Tarasi, Jr., Tarasi & Johnson, P.C., Pittsburgh, PA, for Tarasi.

Peter J. Neeson, LaBrum & Doak, Philadelphia, PA, for Neeson.

Terry S. Hyman, Harrisburg, PA, for Hyman.

Gregory H. Knight, Hetrick, Zaleski, Ernico & Pierce, P.C., Harrisburg, PA, for Knight.

Richard P. Haaz, Philadelphia, PA, for Haaz.

Robert S. Mirin, Harrisburg, PA, for Mirin.

Gary DeVito, Zarwin, Baum, Resnick & Cohen, P.C., Philadelphia, PA, for DeVito.

Shawn A. Bozarth, Harrisburg, PA, for Bozarth.

Melville Graham Merlin Walwyn, Melville G.M. Walwyn, P.C., Harrisburg, PA, for Walwyn.

Joseph D. Shein, Philadelphia, PA, for Shein.

Earl L Harris, Harrisburg, PA, for Harris.

Alfred H. Wilcox, Pepper, Hamilton and Scheetz, Philadelphia, PA, Fred Speaker, Camp Hill, PA, for defendants.

Charles B. Zwally, Mette, Evans & Woodside, Harrisburg, PA, Michael D. Reed, Mette, Evans & Woodside, Harrisburg, PA, Augustine V. Cheng, Associate General Counsel, Office of the General Counsel, New York City, for George Colbert.

## MEMORANDUM

RAMBO, Chief Judge.

Before the court is Defendants' motion for summary judgment as to all Plaintiffs on the grounds that Defendants have not breached their duty of care owed to Plaintiffs. The matter has been fully briefed and is now ripe for review.

### Discussion [1]

Plaintiffs allege that they suffer various injuries caused by radiation released during the accident at Three Mile Island (hereinafter "TMI"). To succeed on their claims, Plaintiffs must establish the duty owed by Defendants, breach of that duty, the proximate cause between the breach and Plaintiffs' compensable injuries, and the damages arising from those injuries.[2]

The question herein analyzed is what duty Defendants owed Plaintiffs. Defendants contend that their duty of care is governed by federal regulations which set the permissible levels of radiation and radioactive emissions (collectively "releases") that a nuclear power plant may disperse. Moreover, they contend they have never exceeded these levels in inhabited areas. In opposition, Plaintiffs argue that Defendants violated those federal regulations, or, in the alternative, that the applicable standard is prescribed by state tort law principles, not the federal regulations.

### I. Summary Judgment Standard

■■■ The standards for the award of summary judgment under Federal Rule of Civil Procedure 56 are well known. As the Third Circuit Court of Appeals recently capsulized:

> Summary judgment may be entered if "the pleadings, deposition[s], answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.

R.Civ.P. 56(c). An issue is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, [247], 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Equimark Comm. Finance Co. v. C.I.T. Financial Serv. Corp.,* 812 F.2d 141, 144 (3d Cir. 1987). If evidence is "merely colorable" or "not significantly probative" summary judgment may be granted. *Anderson,* [477 U.S. at 249] 106 S.Ct. at 2511; *Equimark,* 812 F.2d at 144. Where the record, taken as a whole, could not "lead a rational trier of fact to find for the nonmoving party, summary judgment is proper." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, [586] 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

*Hankins v. Temple Univ.,* 829 F.2d 437, 440 (3d Cir.1987). Once the moving party has shown that there is an absence of evidence to support the claims of the nonmoving party, the nonmoving party may not simply sit back and rest on the allegations in his complaint, but instead must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (*quotations omitted*). The court will consider Defendants' motion under these standards.

### II. Statutory History

An understanding of the applicable standard of care must begin with a brief review of the pertinent legislation. In 1946, Congress passed the Atomic Energy Act, creating a federal monopoly over the use, ownership, and control of nuclear technology. Atomic Energy Act of 1946, Act of Aug. 1, 1946, 60 Stat. 755. Nine years later, Congress passed a second Act to encourage private development in the nuclear industry. Atomic Energy Act of 1954, Act of Aug. 30,

---

1. This court's prior memorandum of June 15, 1993 adequately reviewed the facts and procedural history of the captioned action. Therefore, that background will not be repeated here.

2. Even under a strict liability theory, the analysis herein is applicable. As discussed below, Plaintiffs can not utilize strict liability, negligence, or negligence per se theories if they conflict with the federal regulatory scheme.

1954, ch. 1073, 68 Stat. 919, as amended 42 U.S.C. § 2011, *et seq.* The 1954 Act permitted private ownership and operation of nuclear power facilities but granted the Atomic Energy Commission the exclusive authority to "license the transfer, delivery, receipt, acquisition, possession and use of nuclear materials." *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 207, 103 S.Ct. 1713, 1724, 75 L.Ed.2d 752 (1983) (hereinafter *"Pacific Gas "*) (citing 42 U.S.C. §§ 2014(e), (2), (aa), 2061–64, 2071–78, 2091–2099, 2111–2114 (1976 ed. and Supp. V)). The *Pacific Gas* Court described the new relationship envisioned between the state and federal governments:

> Congress, in passing the 1954 Act and in subsequently amending it, intended that the Federal Government should regulate the *radiological safety* aspects involved in the construction and operation of a nuclear plant, but that the States retain their traditional responsibility in the field of regulating electric utilities for determining questions of need, reliability, cost, and other related state concerns.

*Id.* at 205, 103 S.Ct. at 1722 (emphasis added).

In 1959, Congress amended the Act, spelling out in greater detail the intended relationship between the federal and state governments. *See* 1959 Amendment to the Atomic Energy Act, as codified, 42 U.S.C. § 2021 (1988). While permitting the states more regulatory authority, the law mandated that the federal government regulate the safety aspects of nuclear materials. 42 U.S.C. 2021(c)(4); *Silkwood v. Kerr–McGee, Corp.,* 464 U.S. 238, 250, 104 S.Ct. 615, 622, 78 L.Ed.2d 443 (1984). The law also provided, in part:

> (k) Nothing in this section shall be construed to affect the authority of any State or local agency to regulate the activities for purposes *other than protection against radiation hazards.*

42 U.S.C. § 2021(k) (emphasis added). This provision set the stage for substantial case law exploring the parameters of federal preemption in the radiological safety arena.

In 1957, Congress passed the Price–Anderson Act which amended the Atomic Energy Act. Pub.L. No. 85–256, § 1.71 Stat. 576. The Price–Anderson Act placed a $560 million limit on liability arising from a nuclear accident at certain facilities. This limit was intended to balance the Congressional desire of compensating nuclear accident victims with the goal of encouraging nuclear technology by protecting against cataclysmic financial consequences of an accident.

Finally, in 1988, Congress passed the Price–Anderson Amendments Act extending federal jurisdiction over suits regarding nuclear incidents to include not only "extraordinary nuclear occurrences" but all public liability actions.[3] Pub.L. No. 100–408, 102 Stat. 1066 (1988). More germane to the issue here, the 1988 Amendments directed that the law of the state where the accident occurred be adopted as federal law in such public liability actions. Specifically, the enactment provided:

> A public liability action shall be deemed to be an action arising under section 2210 of this title, and the substantive rules for decision in such action shall be derived from the law of the State in which the nuclear incident involved occurs, *unless such law is inconsistent with the provisions of such section.*

42 U.S.C. § 2014(hh) (emphasis added).

These various statutory provisions are accompanied by a comprehensive system of federal regulations establishing, *inter alia,* levels of permissible radiation. For example, 10 C.F.R. §§ 20.105 sets forth the permissible dose levels of radiation in unrestricted areas; 10 C.F.R. §§ 20.106, the permissible radioactive effluent emissions in unrestricted areas. Defendants contend that these regulations set the applicable standard of care.

The pertinent legislative and case history suggests three routes for determining the relationship between the federal regulations and state tort standards. First, as previous-

---

**3.** A public liability action is any action arising from a nuclear incident and asserting public liability. 42 U.S.C. § 2014(hh).

384

ly stated, 42 U.S.C. § 2021 provides that states retain regulatory functions over the nuclear industry *except* to protect against radiation hazards. This provision has been clarified, as discussed below, by a history of case law examining the preemptive effect of federal law on radiological safety. These cases substantially have adopted field preemption analysis, as further discussed below. A second strand of preemption analysis has focused on any actual conflict between applying federal and state law. Third, 42 U.S.C. § 2014(hh) counsels that public liability actions are governed by state law "unless such law is inconsistent with the provisions of such section [42 U.S.C. § 2210]." This is akin to preemption analysis for "actual conflict."

This court will adopt the preemption mode of analysis herein. This accords with the bulk of the case law on the issue. Moreover, as described below, the cases addressing the applicable standard of care have merged these modes of analysis, using preemption as one indicator of whether state standards are reconcilable with federal ones.

### III. Preemption

■ The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art VI, cl. 2. From this clause flows the doctrine of federal preemption of state law. Case law has established that federal preemption is triggered in three circumstances:

(1) Congress may pass a statute that by its *express* terms preempts a state law,

(2) Congress, though not expressly stating, may *imply* that it is preempting state law by occupation of an entire field of regulation, so that no room is left for supplementary state regulation,

(3) Congress may speak neither expressly nor impliedly of preemption, nonetheless state law is preempted to the extent it *actually* conflicts with federal law; such a conflict occurs when

(a) compliance with both state and federal law is impossible or,

(b) when state law stands as an impediment to a federal purpose.

*Abbot v. American Cyanamid Co.,* 844 F.2d 1108, 1111 (4th Cir.), *cert. denied,* 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988) (citing *Michigan Canners and Freezers Ass'n v. Agric. Mktg. and Bargaining Bd.,* 467 U.S. 461, 469, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984)) (emphasis added). *See also Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992); *English v. General Elec. Co.,* 496 U.S. 72, 78–79, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65 (1990).

■ As this court has previously explained:

Analysis of preemption issues must "start with the assumption that the historic police powers of the States [are] not to be superseded by [federal law] unless that [is] the clear and manifest purpose of Congress." *Cipollone,* [505 U.S. at 516, 112 S.Ct. at 2617] 120 L.Ed.2d at 422 (citing *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 [67 S.Ct. 1146, 1152, 91 L.Ed. 1447] (1947)). There is a strong presumption against preemption when "Congress does not expressly state its intent," *Abbot,* 844 F.2d at 1112 (citing *Maryland v. Louisiana,* 451 U.S. 725 [101 S.Ct. 2114, 68 L.Ed.2d 576] (1981)); when regulations pertain to health or safety issues, *Abbot,* 844 F.2d at 1112 (citing *Hillsborough County v. Automated Med. Labs,* 471 U.S. 707, 715 [105 S.Ct. 2371, 2376, 85 L.Ed.2d 714] (1985)); when there is no federal remedy for the plaintiff's injury, *Abbot,* 844 F.2d at 1112 (citing *Silkwood v. Kerr-McGee, Corp.,* 464 U.S. 238, 251 [104 S.Ct. 615, 623, 78 L.Ed.2d 443] (1984), *reh'g denied,* 465 U.S. 1074 [104 S.Ct. 1430, 79 L.Ed.2d 754] (1984), *cert. denied,* 476 U.S. 1104 [106 S.Ct. 1947, 90 L.Ed.2d 356] (1986)); or in ambiguous cases. *Cipollone,* [505 U.S. at 530, 112 S.Ct. at 2625] 120 L.Ed.2d at 432 (Blackmun, J., concurring).

*Hunsaker v. Surgidev Corp.,* 818 F.Supp. 744, 747 (M.D.Pa.1992), *aff'd,* 5 F.3d 1489 (3d Cir.1993).

## IV. Preemption Law Applied

### A. Regulations

A series of cases have addressed federal preemption of state *regulations* touching on nuclear power. These cases have relied substantially on field preemption analysis. This court has recently analyzed and summarized this case law: "to fall within the preempted field, state regulation must (1) have a direct and substantial effect (2) on decisions regarding radiological safety levels." *McNear v. Pennsylvania State Police*, Civ.Action No. 1:CV–92–1255, slip op. at 16 (May 10, 1993). For example, in the influential case of *Northern States Power Co. v. Minnesota*, 447 F.2d 1143 (8th Cir.1971), *aff'd mem.*, 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972), the court held that federal regulations preempted state regulations governing radioactive emissions, as the latter had a substantial effect on permissible radiation emission levels.

On the other hand, state regulations which only tangentially affect radiological safety have been upheld against preemption challenges. For example, in *English v. General Electric Co.*, 496 U.S. 72, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990), the plaintiff had complained about several alleged violations at the nuclear facility where she worked and was soon after discharged from employment. The Court upheld an award arising from the state tort of intentional infliction of emotional distress since "this effect [wa]s neither direct nor substantial enough to place petitioner's claim in the pre-empted field." *Id.* at 78, 110 S.Ct. at 2274.

Similarly, state regulations have been upheld when their purpose is other than radiological safety. For instance, in *Pacific Gas*, the Court reiterated that states cannot regulate safety aspects of nuclear technology but upheld the challenged state statute, which limited construction of nuclear plants to ensure adequate waste storage and disposal, because of the law's *economic* (rather than radiological safety) purpose. *Pacific Gas*, 461 U.S. at 222–23, 103 S.Ct. at 1731–32. Similarly, in *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 108 S.Ct. 1704, 100 L.Ed.2d 158 (1988), the court determined that a suit arising from state tort law was not preempted since the state regulation at issue was wholly unrelated to radiation safety. Rather, the subject injury was caused by a protruding bolt on a scaffold.

### B. Tort Law

While the cases examining federal preemption of state *regulations* are not necessarily dispositive of the question at bar, they suggest that a similar framework should apply to state *tort* standards with regulatory effects—that if those standards substantially impact on radiological safety, they are preempted by federal regulations.

Standards enacted as state regulations and those arising from common law are indistinguishable in effect. As this court commented in *Hunsaker*:

> Tort remedies *may* have regulatory consequences and thereby impose additional requirements on those parties attempting to comply with federal regulations. *See San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 [79 S.Ct. 773, 781, 3 L.Ed.2d 775] (1959) ("[state] regulation can be as effectively exerted through an award of damages as through some form of preventative relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy."). A jury's finding of liability effectively creates a new standard or duty which defendants must follow to shield themselves from future liability. It is absurd to contend that this fear of liability will not induce manufacturers to conform their conduct to jury-set standards or that these standards do not, in reality, constitute new requirements which defendants must heed.

*Id.* at 751.

Actually, however, even the pivotal case in this field—if not for its holding but for the frequent citations to it—*Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), acknowledged the essential equivalence of common tort law and regulatory law.

In *Silkwood,* the estate [4] of a nuclear facility employee sued the plant for nuclear contamination of Silkwood and her apartment. The plaintiff brought two claims. The first for personal injury was dismissed after an analysis of workers' compensation law. The second, for property damage (arising from the apartment contamination), was brought under a strict liability theory, and resulted in a plaintiff's jury verdict. Addressing Defendants' appeal, the Supreme Court focused on the propriety of allowing punitive damages in the face of the atomic energy statutes cited above.

The Court clearly recognized that federal law preempts much state regulatory law relating to radiological safety:

> Congress' decision to prohibit the States from regulating the safety aspects of nuclear development was premised on its belief that the Commission was more qualified to determine what type of safety standards should be enacted in this complex area.

*Id.* at 250, 104 S.Ct. at 622. The Court went on to acknowledge the similarities between regulatory and common law:

> If there were nothing more, this concern over the State's inability to formulate effective standards and the foreclosure of the States from conditioning the operation of nuclear power plants on compliance with state-imposed safety standards arguably would disallow resort to state law remedies. . . .

*Silkwood,* 464 U.S. at 250–51, 104 S.Ct. at 622–23. However, as the Third Circuit has pointed out, there was "something more"— explicit congressional intent to permit state tort *remedies. In re TMI Litig. Cases Consol. II,* 940 F.2d 832, 859 (3d Cir.1991), *cert. denied sub nom., Gumby v. General Pub. Util. Corp.,* 503 U.S. 906, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992) (footnote omitted) (hereinafter *"TMI II "*) (citing *Silkwood,* 464 U.S. at 254, 104 S.Ct. at 624). After finding that the field preemption doctrine did not preclude application of punitive damages, the *Silkwood* Court then examined the possibility of actual conflict between the award of such

damages and the pertinent federal regulations:

> insofar as damages for radiation injuries are concerned, preemption should not be judged on the basis that the Federal Government has so completely occupied the field of safety that state remedies are foreclosed but on *whether there is an irreconcilable conflict between the federal and state standards* or whether the imposition of a state standard in a damages action would frustrate the objectives of the federal law.

*Silkwood,* 464 U.S. at 256, 104 S.Ct. at 626 (emphasis added). This conflict test is essentially that prescribed by the pertinent federal statute (that went into effect after *Silkwood* )—state law applies *unless* inconsistent (irreconcilable) with federal law. The *Silkwood* Court then concluded that there was no "irreconcilable conflict" between the award of punitive damages under state law and the federal regulations.

At first glance, some of the language and reasoning of *Silkwood* might suggest that state tort standards are not preempted by federal regulations of permissible radiation levels. For several reasons, this court is not persuaded that *Silkwood's* reasoning should be broadly applied to permit state tort standards to eclipse the federal regulations establishing permissible levels of radiation releases.

First, the holding and language of *Silkwood* are limited to *damages. See, e.g., id.* at 256, 104 S.Ct. at 626 (emphasis added) ("insofar as *damages* for radiation injuries are concerned"); *id.* at 251, 104 S.Ct. at 623 (citation omitted) (emphasis added) ("there is no indication that Congress even seriously considered precluding the use of such *remedies* either when it enacted the Atomic Energy Act in 1954 or when it amended it in 1959"); *id.* at 251, 104 S.Ct. at 623 (emphasis added) ("[m]ore importantly, the only congressional discussion concerning the relationship between the Atomic Energy Act and state tort *remedies* indicates that Congress assumed that such *remedies* would be available"); *id.* at 251–52, 104 S.Ct. at 623–24

---

4. Ms. Silkwood was killed in a car accident.

(footnote omitted) (emphasis added) ("the discussion preceding [the Price–Anderson Act's] enactment and subsequent amendment indicates that Congress assumed that persons injured by nuclear accidents were free to utilize existing tort law *remedies* ); *id.* at 253, 104 S.Ct. at 624 (emphasis added) ("The belief that the NRC's exclusive authority to set safety standards did not foreclose the use of state tort *remedies* was reaffirmed when the Price–Anderson Act was amended in 1966"); *id.* at 255, 104 S.Ct. at 625 (emphasis added) ("Other comments made throughout the discussion [before the Joint Committee on Atomic Energy on Proposed Amendments to Price–Anderson Act relating to Waiver of Defenses] were similarly based on the assumption that state *remedies* were available.")

Second, in addition to its focus on damages, the Court omitted any discussion about the relevant standard of care owed to the plaintiff. Although the plaintiff's property claim was brought under a strict liability theory, the Court chose not to address the plaintiff's choice of legal theory. *See Hennessy v. Commonwealth Edison Co.,* 764 F.Supp. 495, 501 (N.D.Ill.1991) ("The propriety of allowing tort recovery on a negligence theory based on evidence of exposures that were otherwise within the permissible federal limits was an issue that was never explicitly addressed by any of the courts on appeal in *Silkwood.* Insofar as the *Silkwood* trial court's decision and the decision in *[Bennett v.] Mallinckrodt,* 698 S.W.2d 854 (Mo.App. 1985), *cert. denied,* 476 U.S. 1176 [106 S.Ct. 2903, 90 L.Ed.2d 989] (1986)) may be read to allow recovery under state law based simply on evidence of a level of exposure less than that permitted by federal regulations, we respectfully disagree with those decisions." (footnotes omitted).

This combination of omissions suggests that the Court's holding is limited to a finding that only that particular state tort remedy is immune from the preclusive grasp of the federal regulations.

Third, the crux of the *Silkwood* opinion was that imposition of punitive (and, implicitly, compensatory) damages would not impermissibly conflict with the federal scheme. While the government in *Silkwood* contended that punitive damages, with their deterrent function, could conflict with any penalty scheme established by the federal regulations, the Court clearly rejected this line of argument.

Addressing the standard of care issue, however, the Third Circuit specifically rejected the argument that state standards would not conflict with federal standards. *TMI II,* 940 F.2d at 859 (distinguishing imposition of punitive damages from imposition of state tort standard, arguing that latter but not former is inconsistent with federal law).

In *TMI II,* while considering the constitutionality of the Price–Anderson Amendments Act of 1988, 42 U.S.C. § 2011 *et seq.,* the court expressed an expansive view of federal preemption:

the Federal government maintains complete control of the safety and 'nuclear' aspects of energy generation ... State safety regulation is not pre-empted only when it conflicts with federal law. Rather, the Federal Government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the States. When the Federal Government completely occupies a given field ... as it has done here, the test of pre-emption is whether the 'matter on which the State asserts the right to act is in any way regulated by the Federal Act.'

*Id.* at 858 (quoting *Pacific Gas & Electric Co.,* 461 U.S. at 212–13, 103 S.Ct. at 1726–27). With these principles in mind, the court opined that the standard of care owed by nuclear power facilities is set by the federal regulations:

Two Supreme Court cases [*Pacific Gas & Electric Co.* and *Silkwood* ] indicate that the duty the defendants owe the plaintiffs in tort is dictated by federal law.

*TMI II,* 940 F.2d at 858 (footnote omitted). The court continued, distinguishing *Silkwood:*

Permitting the states to apply their own nuclear regulatory standards, in the form of the duty owed by nuclear defendants in tort, would ... 'frustrate the objectives of the federal law.'

*Id.* at 859 (quoting *Silkwood,* 464 U.S. at 256, 104 S.Ct. at 625).[5] The court further stated:

> Under *Pacific Gas & Electric Co.,* states are preempted from imposing a non-federal duty in tort, because any state duty would infringe upon pervasive federal regulation in the field of nuclear safety, and thus would conflict with federal law. *See* [*id.*] 461 U.S. at 204 ... [103 S.Ct. at 1722] Consequently, the plaintiffs' rights will necessarily be determined, in part, by reference to federal law, namely the federal statutes and regulations governing the safety and operation of nuclear facilities.

*TMI II,* 940 F.2d at 859–60 (footnote omitted).[6]

Moreover, the Third Circuit was not persuaded that the possibility that state tort law could impose a higher standard than that imposed by the federal regulations would alter its analysis:

> The result [conflict with federal law] is the same regardless of whether the state adopts stricter or more lenient safety standards. If stricter standards are imposed, the state will create a disincentive to nuclear power that is in conflict with federal law. If more lenient standards are imposed, the state will undercut federal safety efforts.

*Id.* at 860 n. 22.

Even Judge Scirica, who, in his concurrence disagreed with the majority that a discussion about the relevant standard of care was necessary to its holding, essentially did agree with the majority about the applicable duty of care. *See id.* at 876 (emphasis added) ("I would sustain § 2210(n)(2) based upon the *substantial likelihood* that public liability actions will involve federal questions regarding [inter alia] standards of care ..."); *id.* at 870 ("Regardless of whether state tort law may impose a standard of care that differs from federal norms, that law will often incorporate federal standards, and therefore a large number of public liability actions will rest upon alleged violations of federal regulations.").

The Third Circuit's opinion about the applicable standards was followed by the Seventh Circuit in *O'Conner v. Commonwealth*

5. The Third Circuit, in Judge Scirica's concurrence, also provided a way of distinguishing another problematic aspect of *Silkwood.* The Court in *Silkwood* had cited to a Senate hearing at which the participants recognized that nuclear plaintiffs could use a strict liability standard, if available at state law. *Id.* at 254, 104 S.Ct. at 624 (citing S.Rep. No. 1605, U.S.Code Cong. & Admin.News 1966, p. 1052 at 12, 89th Cong., 2d Sess., 26 (1966) ("[a] claimant would have exactly the same rights that he has today under existing law—including perhaps, benefit of a rule of strict liability if applicable State law provides.")) Consequently, "[i]f Congress intended to permit strict liability, it could be argued that it also intended to permit the less intrusive option of fault-based standards of care that are more stringent than federal regulations." *In re TMI,* 940 F.2d at 870 n. 3 (Scirica, J., concurring).

However, a strict liability standard clearly collides with the federal regulations on permissible radiation releases, a fact which the court of appeals in *Silkwood* recognized. *Silkwood v. Kerr-McGee Corp.,* 667 F.2d 908, 920 (10th Cir.1981). Thus, the logical consequence is that either strict liability is permitted, even though inconsistent with federal law, or is preempted or precluded, thereby rendering the Senate's remarks misplaced.

Judge Scirica, in *In re TMI,* offered one basis for limiting the reach of *Silkwood's* concern about the viability of strict liability actions. He explained that "[section] 2210(n)(2) encompasses more than just actions incorporating federal standards of care," *In re TMI,* 940 F.2d at 869–70 (Scirica concurring) (citation omitted). Therefore, a strict liability theory could be utilized in situations where state law so permits and where federal regulations concerning permissible radiation releases are not at issue.

6. Plaintiffs contend that this language is but dicta and is therefore not binding on this court. Defendants, in contrast, fervently argue that the language is essential to the court's ultimate holding. The court agrees with Defendants; the Third Circuit was searching for the requisite federal element on which to base the constitutionality of federal question jurisdiction, and found it in the federally prescribed duty of care. Moreover, the language clearly predicts the Third Circuit's opinion on this issue.

Plaintiffs accurately point out that the Third Circuit did not allude to the regulations at issue here—10 C.F.R. §§ 20.105, 20.106—in its analysis whether federal regulations provided the applicable standard of care. Nonetheless, this court is not persuaded that this omission warrants acceptance of Plaintiffs' position. There are a variety of regulations—governing permissible dose limits to workers, to the public and during emergencies. Because the question of which federal standard applies was not before the Third Circuit, it had no reason to discuss the specific regulations.

*Edison Co.*, 13 F.3d 1090 (7th Cir.1994). In *O'Conner*, a worker alleged that he had suffered cataracts caused by overexposure to radiation in the workplace. The nuclear defendants argued that the standard of care owed to the plaintiff should be determined only in reference to the federal regulations setting permissible radiation levels, and that these levels had not been exceeded. The plaintiff countered that the federal safety regulations were merely evidence of the relevant state of care and did not conclusively establish it.

The Seventh Circuit agreed with the defendants, providing three alternative rationales for their conclusion. First, the court cited the portion of the Price–Anderson Amendments Act that dictates that, "the substantive rules for decision in such action shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of such section." 42 U.S.C. § 2014(hh). In determining what Illinois (the forum state) would set as the applicable standard, the court explained that Illinois case law granted federal safety regulations a pivotal role in ascertaining state standards. Illinois case law had utilized the Restatement of Torts § 286[7] to determine the appropriate standard of care in analogous cases. Accordingly, the Seventh Circuit found proper the district court's application and analysis of § 286 and its conclusion that the federal radiation limitations would apply. *Id.* at 1103 n. 11.

The court also analyzed pertinent cases and concluded that the federal regulations would preempt state standards. Citing the Third Circuit, the *O'Conner* stated:

> we agree with the Third Circuit in *TMI* that it is clear from *Pacific Gas & Electric* and from *Silkwood* that state regulation of nuclear safety, through either legislation or negligence actions, is preempted by federal law.

*O'Conner*, at 1105 (citing *TMI*, 940 F.2d at 858).[8] Its conclusion that the federal regulations would preempt any state standard persuaded the *O'Conner* court that the state law setting the applicable standard would be determined wholly by the federal regulations. *Id.* at 1105.

The court also stated that in the event that state law would not apply the federal regulations as the sole standard of care, the state law would be preempted. Finally, the court observed that its conclusion comported with the dictate in the Amendments Act—that state law be applied only if consistent with the Price Anderson Act. *Id.* at 1105. A contrary state standard would upset the Act's careful balance between the dual goals of public protection and radiation development. *Id.* at 1106.

A few district courts have arrived at the same conclusion as *O'Conner*. For example, the court in *Hennessy v. Commonwealth Edison Company*, 764 F.Supp. 495 (N.D.Ill. 1991) adopted the federal permissible dose limits as the applicable standard of care. *Id.* at 502–03. In *Hennessy* (cited favorably by the Third Circuit in *TMI II*, 940 F.2d at 859), the plaintiff, a nuclear power plant employee, was internally contaminated with radioactive cobalt. *Id.* at 497. The plaintiff's concerns

---

7. The Restatement provides:

The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or administrative regulation whose purpose is found to be exclusively or in part
 (a) to protect a class of persons which includes the one whose interest is invaded, and
 (b) to protect a particular interest which is invaded, and
 (c) to protect that interest against the kind of harm that has resulted, and
 (d) to protect that interest against the particular hazard from which the harm results.
Restatement (Second) of Torts, § 286 (1965).

8. The *O'Conner* court further stated:

In the field of nuclear safety, there is not only evidence of preemption, but also uncontradicted statements by the Supreme Court that federal nuclear safety regulations preempt all state safety regulations. For instance, in *Pacific Gas & Electric Co. v. State Energy Conservation & Development Commission*, 461 U.S. 190, 208 [103 S.Ct. 1713, 1724, 75 L.Ed.2d 752] (1983), the Court concluded that 'the safety of nuclear technology was the exclusive business of the Federal Government.' Similarly, in *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 240–41, [104 S.Ct. 615, 617, 78 L.Ed.2d 443] (1984), the Court reiterated that 'states are precluded from regulating the safety aspect of nuclear energy.'
*Id.* at 1104.

about this contamination led to a duodenal ulcer which precipitated his lawsuit.

In appraising the defendants' motion for summary judgement on the first count—negligent infliction of emotional distress—the court addressed the applicable standard of care. The defendants argued that the plaintiff's level of exposure and contamination were within the limits prescribed by the federal regulations, which, they contended, set the applicable standard of care. Relying on the district court's decision in *O'Conner* (which arrived at the same conclusion the appellate court later did), the *Hennessy* court held that the federal radiation limits establish the duty of care owed by the nuclear defendants. *Id.* at 501. Finding that *Silkwood* had never explicitly addressed the issue, the court distinguished *Silkwood*'s holding regarding the propriety of state law remedies from that of state law standards. *Id.* at 501. The court held that states may not regulate the radiological safety elements of nuclear facilities because Congress determined that the federal government is best situated to set the applicable safety standards. *Id.* at 501. The *Hennessy* court thus concluded that the federal regulations setting the permissible dose levels, 10 C.F.R. § 20.103 (setting dose limits for restricted areas), conclusively established the applicable standard of care. *Id.* at 501.

Other cases have embraced similar reasoning, and arrived at the same conclusion. *See Coley v. Commonwealth Edison Co.,* 768 F.Supp. 625 (N.D.Ill.1991) (court adopted federal regulations on permissible occupational exposure of radiation); *Jurka v. Commonwealth Edison Co.,* No. 88C7852 (N.D.Ill. Aug. 9, 1990) (court adopted federal permissible dose limit as standard of care after

analysis pursuant to Restatement § 286); *Whiting v. Boston Edison Co.,* 1990 WL 150010 No. 88–2125, slip op. at 2 (D.Mass. Sept. 5, 1991) (court adopted federal permissible dose standards; "To the extent that a question of state law might be raised that question is resolved by the opinion in [*TMI II* ].") *But see McKay v. United States,* 703 F.2d 464 (10th Cir.1983).[9]

## C. Conclusion

 The court's survey of the relevant case law clearly indicates that state regulations impacting radiological safety are preempted, under the field preemption doctrine. Further, case law addressing state tort standards counsels that if those standards conflict with federal standards, both the statutory mandate in 42 U.S.C. § 2014(hh), and preemption analysis, require that the state standard yield. While *O'Conner* arrived at the same conclusion only after first determining the scope of the state standard, this court believes that the latter inquiry is unnecessary, since no state standard but that adopting the federal standard could survive the analysis herein described. Thus, this court need not analyze what Pennsylvania law would prescribe. Unless Pennsylvania adopts the federal standard, it would be displaced by the federal regulations.

## V. Federal Regulations

Having determined that federal regulations provide the applicable standard of care in the captioned action, the court must next determine exactly what those regulations prescribe. The pertinent regulations set specific levels of permissible radiation and

9. In *McKay,* the plaintiffs, landowners residing around a nuclear weapons manufacturer, alleged that their soil had been contaminated by nuclear radiation. The court cited the Tenth Circuit opinion in *Silkwood,* 667 F.2d 908 (10th Cir. 1981) (the Supreme Court had not yet heard the *Silkwood* appeal) for the proposition that the Price–Anderson Act only preempts state tort law after a specific and factual analysis indicates that "the state action at issue 'competes substantially with the [Atomic Energy Commission] in its regulation of radiation hazards associated with plants having nuclear material." *Id.* at 469 (quoting *Silkwood,* 667 F.2d at 923). The court

then reasoned that the facts of the case were not sufficiently different from the circumstances in *Silkwood* to warrant a different conclusion—that state tort action should not be precluded. *Id.* at 469. The court concluded that imposing tort liability would not significantly interfere with the federal regulations. *Id.* at 469.

While the decision in *McKay* does not support Defendants' position, neither is it very damaging. The court in *McKay* analyzed whether federal law preempted a private cause of action under state law; it never specifically addressed the question of what duty of care would be imposed on the defendants.

effluents. The section limiting radiation, 10 C.F.R. § 20.105, provides:

(a) There may be included in any application for a license or for amendment of a license proposed limits upon levels of radiation in unrestricted areas resulting from the applicant's possession or use of radioactive materials and other sources of radiation. Such applications should include information as to anticipated average radiation levels and anticipated occupancy times for each unrestricted area involved. The Commission will approve the proposed limits if the applicant demonstrates that the proposed limits are not likely to cause any individual to receive a dose to the whole body in any period of one calendar year in excess of 0.5 rem.

(b) Except as authorized by the Commission pursuant to paragraph (a) of this Section, no licenses shall possess, use or transfer licensed material in such a manner as to create in any unrestricted area from radioactive material and other sources of radiation in his possession:

(1) Radiation levels, which, if an individual were continuously present in the area, could result in his receiving a dose in excess of two millirems in any one hour, or

(2) Radiation levels which, if an individual were continuously present in the area, could result in his receiving a dose in excess of 100 millirems in any seven consecutive days.

10 C.F.R. § 20.105. This section refers to "radiation," that is, rays (alpha, beta, gamma) emanating from a radioactive source located on the regulated site. *See* 10 C.F.R. § 20.3(12); Rogers Aff. (Def.Ex. E) at ¶ 11. The provision invites nuclear facilities to adopt one of two approaches. First, a facility may set its own radiation rates in unrestricted areas after Commission approval. The approval process requires that the applicant provide detailed information and ensure that individuals outside the restricted area will not receive more than .5 rems (500 mrems) per year. Second, the facility may observe the radiation limits established in § 20.105(b) (2 mrems per hour or 100 mrems in a week).

A second regulatory section addresses emission levels; 10 C.F.R. § 20.106 provides:

(a) A licensee shall not possess, use, or transfer licensed material so as to release to an unrestricted area radioactive material in concentrations which exceed the limits specified in Appendix "B," Table II of this part, except as authorized pursuant to § 20.302 [waste disposal] of paragraph (b) of this section. For purposes of this section concentrations may be averaged over a period not greater than one year.

(b) An application for a license or amendment may include proposed limits higher than those specified in paragraph (1) of this section. The Commission will approve the proposed limits if the applicant demonstrates:

(1) That the applicant has made a reasonable effort to minimize the radioactivity contained in effluents to unrestricted areas; and

(2) That it is not likely that radioactive material discharged in the effluent would result in the exposure of an individual to concentrations of radioactive material in air or water exceeding the limits specified in Appendix "B," Table II of this part.

(c) An application for higher limits pursuant to paragraph (b) of this section shall include information demonstrating that the applicant has made a reasonable effort to minimize the radioactivity discharged in effluents to unrestricted areas, and shall include, as pertinent:

(1) Information as to flow rates, total volume of effluent, peak concentration of each radionuclide in the effluent, and concentration of each radionuclide in the effluent averaged over a period of one year at the point where the effluent leaves a stack, tube, pipe, or similar conduit;

. . . .

(3) A description of the anticipated human occupancy in the unrestricted area where the highest concentration of radioactive materials from the effluent is expected, and, in the case of a river or stream, a description of water uses

downstream from the point of release of the effluent.

. . . .

(d) For the purposes of this section the concentration limits in Appendix "B," Table II of this part shall apply at the boundary of the restricted area. The concentration of radioactive material discharged through a stack, pipe or similar conduit may be determined with respect to the point where the material leaves the conduit. If the conduit discharges within the restricted area, the concentration at the boundary may be determined by applying appropriate factors for dilution, dispersion or decay between the point of discharge and the boundary. . . .

10 C.F.R. § 20.106 (January 1, 1979). Appendix B then details permissible levels of numerous radioactive elements at the boundary of the restricted area. 10 C.F.R. Pt. 20 App. B. This section regulates radioactive materials, often in the form of particulates. These "emissions," then are different from simple radiation—and, are, consequently, disparately measured. Both sections—the first governing dosage from on-site radiation sources, the second governing radioactive emission levels—are relevant to the accident at TMI. (Def.Br. at 64.)

Defendants assert that the limits found in the two above-cited provisions conclusively establish the standard of care. Plaintiffs, however, point to an additional regulatory section which provides: "in addition to complying with the requirements set forth in this part, make every reasonable effort to maintain radiation exposures, and releases of radioactive materials in effluents to unrestricted areas, as low as is reasonably achievable [hereinafter 'ALARA']." Moreover, for emissions (as opposed to radiation) Appendix I to Part 50 establishes levels which "shall be deemed a conclusive showing of compliance with" the ALARA requirement. *See also* 10 C.F.R. §§ 50.34a(a), 50.36a(b). These figures permit the flexible and economic construction of a nuclear facility by permitting a minimal amount of acceptable releases.

Plaintiffs argue that Defendants were under a duty to limit radiation emissions to ALARA, rather than merely to contain radia-

tion exposures to those provided in the aforementioned sections. At least one case has used ALARA as the applicable standard. In *Crawford v. National Lead Company,* the court noted:

The AEC has established by regulation maximum permissible releases of source materials into the environment. 10 C.F.R. § 20.106 and App. B, Table II; *see Train v. Colorado Pub. Interest Research Group,* 426 U.S. 1, 6 . . . [96 S.Ct. 1938, 1941, 48 L.Ed.2d 434] (1976). . . . The evidence in the instant case shows that defendants exceeded the dose limits set by the applicable regulations. For example, the DOE recognized that airborn uranium from the [defendant facility] had travelled offsite in heavy concentrations, thereby violating the 'as low as reasonably achievable' (ALARA) requirement codified at 10 C.F.R. 2.0.1.

784 F.Supp. at 439, 447 (S.D.Ohio 1989) (footnote omitted).

This court is not persuaded that the ALARA language sets the standard beyond which Defendants can be found liable. The regulations specifically provide: "These numerical guides for design objectives and limiting conditions for operation are not to be construed as radiation protection standards." 10 C.F.R. § 50.34a(a). Moreover, establishing the emission standard in reference to ALARA with its accompanying table would nullify the import of § 20.106.

On the other hand, the court is not persuaded that the ALARA language is altogether without significance. Rather, the regulations suggest that, at least for radioactive emissions, a tri-level scheme governs the standard of care owed by nuclear defendants.

First, Appendix I sets out emission levels which conclusively demonstrate that a nuclear operator is maintaining radioactive emissions at the ALARA level. Since nuclear facility operators need not construct a plant that emits less than the ALARA levels, these figures indicate a cut-off, below which nuclear defendants cannot be liable.

Second, the regulations suggest that nuclear facilities may emit more than that recommended by Appendix I but should attempt to keep releases low:

. . . the licensee is permitted the flexibility of operation, compatible with consider-

ations of health and safety, to assure that the public is provided a dependable source of power even under unusual operating conditions which may temporarily result in releases higher than such small percentages, but still within the limits specified in § 20.106 of this chapter and the operating license. It is expected that in using this operational flexibility under unusual operating conditions, the licensee will exert his *best efforts to keep levels of radioactive material in effluents as low as is reasonably achievable.* The guides set out in appendix I provide numerical guidance on limiting conditions for operation for light-water-cooled nuclear power reactors to meet the requirement that radioactive materials in effluents released to unrestricted areas be kept as low as is reasonably achievable.

10 C.F.R. § 50.36a(b). This results, essentially, in a negligence standard. Third, § 20.106 counsels that emissions in excess of the listed amounts expose the nuclear facility to liability.

In sum, the court concludes that if Defendants can prove that emissions levels were kept below those prescribed by the ALARA limits, they have met the applicable standard of care and, therefore, will be immune from liability for actions premised on the release of emissions. Moreover, if Plaintiffs can prove that Defendants' emissions exceeded those levels set out in § 20.106, Defendants will have violated the relevant standard of care and will be held liable, provided Plaintiffs are also able to satisfy the causation and harm elements of their claims. If the evidence indicates that emissions levels fall between the two standards, Defendants may be held liable if Plaintiffs can prove (along with the causation and harm prongs) that Defendants did not use their best efforts to reduce radioactive emissions.

There are no corresponding figures for radiation releases that conclusively establish that the ALARA level has been met. Thus, the court concludes that if Plaintiffs can prove that Defendants exceeded the standards regulating radiation, and if they can prove the additional requirements—causation and damages—Defendants will be found liable. Further, if Plaintiffs cannot show that radiation exceeded federal standards, but can show that Defendants have not used reasonable efforts to keep radiation ALARA, along with the causation and harm elements, Defendants will also be held liable.

## VI. Was the Standard Breached?

Defendants argue that no radiation or radioactive emissions exceeded the federal levels in *inhabited* areas. Stating this theory in a slightly different form, Defendants claim "the evidence shows that none of the plaintiffs was exposed to radiation in amounts in excess of the permissible levels contained in the relevant federal regulations governing offsite exposures to the general population." (Def.Br. at 4.) Plaintiffs, of course, disagree.

Part of this question is legal, part factual. First, the court must determine whether Plaintiffs must prove that radioactive releases exceeded federal levels in any unrestricted area, or whether they must also show that the excess occurred in inhabited areas, or, more specifically, in areas where Plaintiffs were located. To some degree, this question converges with the causation inquiry—for if Plaintiffs cannot prove that the levels exceeded the federal limits in any inhabited areas where they were located, it is likely that they will not be able to prove causation.

The second question is factual—did Defendants actually release radiation or radioactive emissions in excess of federal levels? This question is hotly debated by the parties' experts.

### A. Legal Question

Defendants argue that, even if permissible levels are exceeded at the site boundary, they cannot be held liable unless the federal levels also were exceeded in inhabited areas, i.e. where Plaintiffs resided. (Def.Br. at 66.)

The court finds no support for Defendants' position in either the regulations or the pertinent statutes or case law. The regulations do not include language that require human presence in an unrestricted area to trigger application of the regulations. Part (a) of § 20.105 does permit a nuclear facility to

propose its own levels of radiation "if the applicant demonstrates that the proposed limits are not likely to cause any individual to receive a dose to the whole body in any period of one calendar year in excess of 0.5 rem." However, Defendants provide no information to the court indicating that they have proceeded under this section.

Part (b) of § 20.105 mandates that a nuclear facility cannot release "[r]adiation levels, which, if an individual were continuously present in the area, could result in his receiving a dose in excess of *two millirems in any one hour*, or ... [r]adiation levels which, if an individual were continuously present in the area, could result in his receiving a dose in excess of 100 millirems in any seven consecutive days." 10 C.F.R. § 20.105. This section certainly implies a goal of protecting human life, but, with the conditional "if," does not confine its protection to only areas that actually were inhabited at a particular time.

Similarly, 10 C.F.R. § 20.106, *inter alia,* proscribes a nuclear facility from "releas[ing] to an unrestricted area radioactive material in concentrations which exceed the limits specified in Appendix 'B,'...." Again, this mandate is not made contingent on human presence in the area where emissions are released. Part (b) does permit a nuclear facility to propose its own limits, upon a showing "[t]hat it is not likely that radioactive material discharged in the effluent would result in the exposure of an individual to concentrations of radioactive material in air or water exceeding the limits specified in Appendix 'B'...." This also suggests a concern with human, as opposed to ecological, contamination. Nonetheless, Part (c) admonishes nuclear operators to make "a reasonable effort to minimize the radioactivity discharged in effluents to unrestricted areas...." The section includes no requirement of human presence. Similarly, Part (d) provides:

> For the purposes of this section the concentration limits in Appendix "B," Table II of this part shall apply at the boundary of the restricted area. The concentration of radioactive material discharged through a stack, pipe or similar conduit may be de-

termined with respect to the point where the material leaves the conduit. If the conduit discharges within the restricted area, the concentration at the boundary may be determined by applying appropriate factors for dilution, dispersion or decay between the point of discharge and the boundary.

10 C.F.R. § 20.106 (January 1, 1979). This very clearly indicates that measurement of effluents for the purposes of the regulatory levels does not take place only in inhabited regions, but either at the boundary of the restricted area, or the conduit exit.

If plaintiffs owned uninhabited land surrounding a nuclear facility, the court is not persuaded that they would not have a cause of action for property damage if the facility released radiation in excess of federally prescribed levels. This conclusion arises not only from the possibility of property, in contrast to personal, damage but also from the recognition that the federal regulations protect not only human life, but ecological health.

In sum, the court finds that Defendants' duty of care is determined solely in reference to the federal regulations, and, further, that a breach occurs when that duty is violated at the boundary of the restricted area.

### B. Factual Question

The parties have submitted contrary evidence about radiation releases after the TMI accident. Defendants have presented evidence that radiation and emissions did not exceed applicable federal limits. Defendants assert that less than 9 million curies of radiation (primarily xenon–133) were released during the accident. (Daniel Aff. (Def.Ex. B) at ¶ 36.) Moreover, one of Defendants' reports concluded that the maximum theoretical human exposure outside TMI was less than 100 millirem. (TDR–TMI–116 (Exh. B attached to Woodard Aff. (Def.Ex. C)) at 4–19.) Similarly, testing of environmental samples did not indicate that radioactive releases exceeded permissible levels. (Porter Aff. (Def.Ex. D) at ¶ 23.) Thermoluminescent dosimeters, (hereinafter "TLD's") used to measure gamma radiation, set up throughout the surrounding region also indicated millirem levels far below the permissible levels. (*Id.*

at ¶¶ 12, 14.) Similarly, the President's Commission on the Accident at TMI concluded that even those residing within one mile received an average dose of only 58.6 mrem, a figure far below the 500 mrem permissible level. (Def.Ex. H at 117.)[10]

In opposition, Plaintiffs have submitted three types of evidence. The first challenges the accuracy and scientific reliability of Defendants' proffered studies. For example, Plaintiffs have submitted evidence that Defendants' experts' erroneously computed the amount of radiation releases. (Ghanem Aff. (Pl.Ex. C) ¶ 113, 14, 24, 37; Hinrichsen Aff. (Def.Ex. G) at 6, 8; Vergeiner Aff. (Def.Ex. H) at 4.) Dr. Karsten Hinrichsen and Dr. Ignez Vergeiner, both meteorologists, have raised purported flaws in Woodard's research for failing to take into account certain factors. (Pl.Exs. G, H.) Finally, Dr. Peter Brunner, a health physicist, has concluded that Defendants' evidence regarding whole body scans of individuals living near TMI was flawed in failing to account for biological half life and excretion. (Pl.Ex. J.)

Plaintiffs also have presented evidence that radiation releases *did* exceed federal levels. Dr. Webb, a nuclear engineer, reviewed the various reports compiled and concluded that the releases from the accident were ten times higher than that estimated by Defendants; specifically, he believes that about 103 million curries of radioactive gases were released. (Webb Aff. at ¶ 44.) Dr. George Ghanem, an atmospheric transfer physicist, maintained that Defendants' experts failed to take into account meteorology and transfer physics in their calculations and concluded that radiation exposures far exceeded federally established permissible levels. (Ghanem Aff. at ¶ 35.) Similarly, Dr. James Gunckel, a radiobiologist and botanist, analyzed biological indicators of radiation and determined that radiation exceeding the fed-

eral levels was released from TMI. (Gunckel Aff. (Pl.Ex. D) at 10–11). Dr. Bruce Moholt, a biogenetist and toxicologist came to the same determination after analysis of lymphocyte depression, blood chemistry and cancer rates in the population residing near to TMI; he deducted that individuals were exposed to radiation in excess of 100 rems. (Moholt Aff. (Pl.Ex. E) at 6.) The research of Dr. Steven Wing, an epidemiologist, disclosed heightened rates of cancer which the doctor believes were caused by exposures above the regulatory limits, and concluded that radiation exposure exceeded 50 rems. (Wing Aff. at ¶ 8.) Finally, Plaintiffs have submitted evidence regarding the efforts Defendants took to minimize radiation release; this information could be relevant, as described above, if Plaintiffs are unable to prove that Defendants exceeded federal standards but can prove that their emissions exceeded the figures set out in the ALARA appendix.

Defendants have filed a motion to depose Plaintiffs' experts and have indicated that they seek to challenge the admissibility of some or all of the testimony of those experts. Assuming for the moment the admissibility of Plaintiffs' expert evidence, there remains a clear dispute as to a material fact—what radiation and emissions were released. This factual question cannot be resolved in this memorandum, defeating the propriety of summary judgment.

At this point, the court will require the parties to confer in an attempt to agree on a plan and schedule to determine the admissibility of expert evidence. Such a meeting should take place within twenty days of this order. Within five days of the parties' meeting, the parties should submit a joint status report on the status of the expert testimony and other issues in this case. The court will contact the parties to schedule another in-

10. Defendants also submit evidence relevant to the argument described above—that no excess releases reached any inhabited areas, much less those inhabited by Plaintiffs. For example, Defendants' evidence indicates that the only regions where the effluents and the dose exceeded the federal levels were Three Mile Island itself, some of the Susquehanna River, and some other uninhabited islands in the river. (Woodard Aff. at figs. 1, 3, 4.) (Note that Figure 2 indicates an excess of radiation of one of the Susquehanna River's banks. *Id.* at fig. 2.) Similarly, the Ad Hoc Dose Assessment Group, comprised of seven members of federal agencies, found no dose levels to individuals in excess of permissible levels. (Ad Hoc Group Report (Def.Ex. G) at 44–48.) Finally, Defendants' evidence indicates that residents near TMI tested negative for TMI contamination. (Porter Aff. (Def.Ex. D) at ¶ 17.)

chambers conference shortly thereafter. An appropriate order will be issued.

### ORDER

In accordance with the accompanying memorandum, **IT IS HEREBY ORDERED:**

(1) Defendants' motion for summary judgment is **GRANTED** in part and **DENIED** in part.

(a) The standard of care in the captioned action is that set forth in §§ 20.105 and 20.106.

(b) Defendants have failed to show that no factual dispute remains as to whether they breached this standard.

(2) Within twenty days of this order, the parties shall meet and confer in an attempt to develop a plan and schedule for determining the admissibility of expert evidence. Within five days after the meeting, the parties shall file a joint status report regarding the expert testimony issue and other outstanding issues in the case.